## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **JERRY L. SALYERS,** | ) | |
| Plaintiff | ) | |
| v. | ) | Civil Action No. 2:14cv00015 |
| | ) | **MEMORANDUM  OPINION** |
| **CAROLYN W. COLVIN,** | ) | |
| **Acting Commissioner of** | ) | |
| **Social Security,** | ) | By:   PAMELA MEADE SARGENT |
| Defendant | ) | United States Magistrate Judge |

*I. Background and Standard of Review*

Plaintiff, Jerry L. Salyers, ("Salyers"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying his claims for disability insurance benefits, ("DIB"), and supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. §§ 423 and 1381 *et seq.* (West 2011 & West 2012). Jurisdiction of this court is pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). This case is before the undersigned magistrate judge upon transfer by consent of the parties pursuant to 28 U.S.C. § 636(c)(1).

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion.  It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance."  *Laws v. Celebrezze,* 368 F.2d 640, 642

Case 2:14-cv-00015-PMS   Document 15   Filed 09/25/15   Page 1 of 32   Pageid#: 687

(4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Salyers protectively filed his applications for SSI and DIB on February 18, 2011, alleging disability as of September 15, 2006, due to anxiety and anxiety attacks, back problems, blackout spells, memory loss, headaches, asthma and difficulty with memory and concentration. (Record, ("R."), at 197-98, 201-07, 219, 223, 241.) The claims were denied initially and upon reconsideration. (R. at 111-13, 118-20, 124, 126-28, 130-32, 133-35, 137-39.) Salyers then requested a hearing before an administrative law judge, ("ALJ"). (R. at 140-41.) A hearing was held by video conferencing on December 3, 2012, at which Salyers was represented by counsel. (R. at 33-58.)

By decision dated December 6, 2012, the ALJ denied Salyers's claims. (R. at 16-27.) The ALJ found that Salyers met the disability insured status requirements of the Act for DIB purposes through December 31, 2011. (R. at 18.) He found that Salyers had not engaged in substantial gainful activity since September 15, 2006, the alleged onset date. (R. at 18.) The ALJ found that the medical evidence established that Salyers had severe impairments, namely chronic back pain; blackout spells; headaches; memory loss; and anxiety, but he found that Salyers did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 18-20.) The ALJ found that Salyers had the residual functional

capacity to perform medium work[1] requiring no more than one- to two-step job instructions and no more than occasional interaction with the general public.[2] (R. at 20.) The ALJ found that Salyers was unable to perform any of his past relevant work. (R. at 25.) Based on Salyers's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that a significant number of jobs existed in the national economy that Salyers could perform, including jobs as a hand packager, a laundry worker and a salvage worker. (R. at 25-26.) Thus, the ALJ concluded that Salyers was not under a disability as defined by the Act and was not eligible for DIB or SSI benefits. (R. at 26-27.) *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (2015).

After the ALJ issued his decision, Salyers pursued his administrative appeals, (R. at 9-12), but the Appeals Council denied his request for review. (R. at 4-8.)[3] Salyers then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.1481 (2015). This case is before this court on Salyers's motion for summary judgment filed November 21, 2014, and the Commissioner's motion for summary judgment filed December 29, 2014.

---

[1] Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of items weighing up to 25 pounds. If someone can perform medium work, he also can perform light and sedentary work. *See* 20 C.F.R. §§ 404.1567(c), 416.967(c) (2015).

[2] The ALJ placed a number of exertional limitations on Salyers's work-related abilities. (R. at 20.) However, because Salyers does not challenge the ALJ's findings with regard to his physical impairments, the undersigned will focus on the facts relevant to Salyers's alleged mental impairments.

[3] By letter dated May 19, 2014, the Appeals Council reported that it had reviewed additional information related to Salyers's claims. However, it again found no reason to reopen and change the ALJ's unfavorable decision. (R. at 1-2.)

Case 2:14-cv-00015-PMS   Document 15   Filed 09/25/15   Page 3 of 32   Pageid#: 689

## II. Facts[4]

Salyers was born in 1964, (R. at 197, 201), which classifies him as a "younger person" under 20 C.F.R. §§ 404.1563(c), 416.963(c). He has a tenth-grade education and attended some special education classes. (R. at 224.) Salyers also has training in the field of masonry. (R. at 37-38, 224.) He has past work experience as a carpenter, a cook and delivery person for a pizza restaurant, a general laborer and a helper. (R. at 224.) Salyers testified that he stopped working in September 2006 after being injured in a motor vehicle accident. (R. at 38.) He stated that he had severe anxiety attacks, lasting 10 to 15 minutes, and had difficulty being around people. (R. at 41, 47.) Salyers testified that he took Klonopin and Lexapro, both of which sometimes helped. (R. at 48.) He testified that there were no triggers for his panic attacks, but a lot of times he stayed in the house all day, and he could no longer stand to go in stores. (R. at 41, 48.) Salyers also testified that he had experienced blackout spells and headaches since the motor vehicle accident. (R. at 41-42, 50.) Salyers estimated that he had three to four bad days weekly, during which he would not leave his bedroom. (R. at 51-52.)

Salyers testified that he lived in a camper on his sister's land, but he would visit his daughter and grandchildren in a nearby town. (R. at 45.) He stated he could fix sandwiches for himself, care for his personal hygiene unless his back was hurting, sometimes take care of basic home maintenance, mow with a riding mower, change the oil or put brakes on a car, sweep, wash dishes and make the

---

[4] The relevant time period for determining disability in this case is from September 15, 2006, the alleged onset date, through December 6, 2012, the date of the ALJ's decision, for SSI purposes, and through December 31, 2011, the date last insured, for DIB purposes. Also, as previously stated, Salyers challenges only the ALJ's findings with regard to his mental impairments. Thus, I will focus on the medical records pertinent thereto.

-4-

bed. (R. at 45-46.) Salyers stated that he enjoyed fishing and deer hunting, which he had attempted to continue doing, but panicked so badly, he had to return home. (R. at 45.) He further testified that he enjoyed walking through the woods and hiking. (R. at 46.)

Mark Hielman, a vocational expert, also was present and testified at Salyers's hearing. (R. at 52-58.) Hielman classified Salyers's past work as a general construction laborer and as a derrick hand or derrick worker as heavy[5] and semi-skilled, as a carpenter in the construction industry as medium and skilled, as a cook and delivery person for a pizza restaurant as medium and unskilled and as a buffering, loader, helper at the marble company as heavy and unskilled. (R. at 54-55.) Hielman was first asked to consider a hypothetical individual of Salyers's age, education and work history who could perform medium work requiring only one- to two-step job instructions, occasional climbing of ramps and stairs, no climbing ladders, ropes or scaffolds, occasional balancing, stooping, kneeling, crouching and crawling and frequently reaching, handling, feeling and fingering objects. (R. at 55-56.) This individual also should avoid concentrated exposure to vibration and even moderate exposure to hazards and could have no more than occasional contact with the general public. (R. at 56.) Hielman testified that such an individual could not perform any of Salyers's past work, but could perform other jobs existing in significant numbers in the national economy, including those of a hand packager, a laundry worker and a salvage or recycle laborer. (R. at 56-57.) Hielman next testified that a hypothetical individual who had no useful ability to interact with co-workers, to deal with the public, to use judgment, to deal with

_____

[5] Heavy work involves lifting items weighing up to 100 pounds at a time with frequent lifting or carrying of items weighing up to 50 pounds. If someone can perform heavy work, he also can perform medium, light and sedentary work. *See* 20 C.F.R. §§ 404.1567(d), 416.967(d) (2015).

work stresses and to demonstrate reliability and who would be absent from work more than two days per month could not perform any work. (R. at 57.)

In rendering his decision, the ALJ reviewed records from St. Mary's Hospital; Russell County Medical Center; Stone Mountain Health Services; Kristie Nies, Ph.D., a neuropsychologist; Wellmont Lonesome Pine Hospital; Dr. Joseph T. Phillips, M.D.; Joseph Leizer, Ph.D., a state agency psychologist; Julie Jennings, Ph.D., a state agency psychologist; Dr. Danny Minor, M.D.; Park Avenue Wellness; Bristol Neurological Associates; Dr. Jeff Wallace, M.D.; Medical Associates of Southwest Virginia; Crystal Burke, a licensed clinical social worker; East Kentucky Psychological Services, Incorporated; Dr. Victoria Grady, M.D.; and B. Wayne Lanthorn, Ph.D., a licensed clinical psychologist. Salyers's attorney submitted additional evidence from Burke to the Appeals Council.[6]

The record shows that Salyers was involved in a motor vehicle accident on September 5, 2006, for which he received treatment at Russell County Medical Center. (R. at 277-85.) A past history of "nerves" was noted, and Salyers reported that he was taking Klonopin. (R. at 279.) He was confused with a headache and tingling, back pain, neck pain and chest pain. (R. at 277.) Salyers was alert and fully oriented with a normal mood and affect, and he demonstrated normal behavior appropriate for his age and the situation. (R. at 278, 280, 389.) It was noted that Salyers had adequate support systems and could perform all activities of daily living without assistance. (R. at 280.) He was diagnosed with multiple

---

[6] Since the Appeals Council considered and incorporated this additional evidence into the record in reaching its decision, (R. at 4-8), this court also must take this evidence into account when determining whether substantial evidence supports the ALJ's findings. *See Wilkins v. Sec'y of Dep't of Health & Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991).

Case 2:14-cv-00015-PMS   Document 15   Filed 09/25/15   Page 6 of 32   Pageid#: 692

contusions and strains and was discharged home in stable condition with prescriptions for Lorcet, Flexeril and Phenergan. (R. at 278, 390.)

Salyers treated at Medical Associates of Southwest Virginia from June 22, 2005, through March 20, 2008. (R. at 479-501.) Over this treatment period, Salyers's complaints were mostly physical in nature, including back and neck pain, dizziness and vertigo, headaches, blackout episodes and sinus-related symptoms. (R. at 485-86, 489-91, 493-95.) However, on November 28, 2006, Dr. Gary S. Williams, M.D., noted that he was continuing Salyers on Klonopin and Lexapro. (R. at 489.) On January 30, 2007, Stacey Gipe, P.A.C., a physician's assistant, diagnosed Salyers with depression, among other things, despite no such complaints from Salyers on that date. (R. at 486.) On July 11, 2007, Salyers denied suicidal or homicidal ideations. (R. at 485.)

On January 24, 2007, Salyers saw Dr. W. Jeffrey Wallace, D.O., an ear, nose and throat specialist, for his complaints of vertigo. (R. at 477.) A review of symptoms was positive for "nervous disorder," among other things. (R. at 477.) On examination, Salyers was alert and fully oriented and ambulated under his own power. (R. at 477.) Salyers was diagnosed with vertigo of unknown etiology. (R. at 477.)

When Salyers presented to the emergency department at Lonesome Pine Hospital on August 10, 2007, after having four near syncopal episodes over the prior three hours, he was alert and fully oriented with normal speech and cognition. (R. at 381-82.) His mood and affect were deemed normal, and he was cooperative and interactive. (R. at 382.)

On August 13, 2007, Salyers returned to Medical Associates of Southwest Virginia, where he was diagnosed with anxiety / depression, among other things. (R. at 484.) On August 28, 2007, Salyers's chief complaint was episodes of dizziness and unsteadiness, particularly with turning his head to the right, and feelings of fogginess in his head at times. (R. at 483.) However, along with Salyers's physical diagnoses, Dr. Williams diagnosed a component of anxiety and depression, and he was continued on Lexapro and Klonopin. (R. at 483.) Dr. Williams opined that "the situation is certainly not a simple case of 'malingering,'" but could be a brain processing problem. (R. at 483.) On February 5, 2008, Salyers stated that he had been a little bit anxious and mildly depressed due to continued neurologic symptoms and headaches, resulting in an inability to drive. (R. at 480.) Gipe diagnosed a history of anxiety / depression in addition to his physical ailments. (R. at 480.) Gipe continued Salyers on Klonopin, gave him samples of Lexapro and prescribed Celexa. (R. at 480.)

Salyers saw Dr. Paul Augustine, M.D., at Stone Mountain Health Services, ("Stone Mountain"), on January 30, 2009, to establish his status as a new patient. (R. at 296-97.) In addition to physical maladies, Salyers reported anxiety and insomnia, for which he took Klonopin. (R. at 297.) He was alert and oriented, in no acute distress and had no focal deficits. (R. at 296.) When Salyers returned to Dr. Augustine on February 19, 2009, he again was in no distress, stable, alert and oriented, and he had no focal deficits. (R. at 294.) On May 29, 2009, Salyers reported that he had some problems with anxiety, depression and insomnia. (R. at 292.) He again was alert and oriented, in no acute distress, and he had no focal deficits. (R. at 292.) Dr. Augustine diagnosed anxiety and insomnia, for which he prescribed BuSpar, and depression, for which he prescribed Celexa. (R. at 292.)

On September 9, 2009, Salyers returned to Stone Mountain, requesting something for his "nerves." (R. at 346.) A history of anxiety and depression was noted, and a review of systems was positive for anxiety. (R. at 346.) Nonetheless, Salyers was fully oriented. (R. at 345.) He was diagnosed with an anxiety disorder and was prescribed Klonopin. (R. at 344.) On October 2, October 30, and November 30, 2009, Salyers was fully oriented and was diagnosed with an anxiety disorder. (R. at 335-36, 338-39, 341-42.) On January 18, 2010, he again was fully oriented, but his blood pressure was elevated due to anxiety. (R. at 333.)

Salyers saw Kristie Nies, Ph.D., a neuropsychologist, for an evaluation of his then-current cognitive and affective functioning at the request of counsel on February 9, 2010. (R. at 306-12.) He did not appear to have difficulty understanding or retaining test directions, and Salyers denied significant difficulty with attention. (R. at 306.) Salyers's conversational speech was essentially normal, his affect was appropriate, and his mood was neutral. (R. at 306.) He was fairly pleasant and cooperative throughout the interview and testing. (R. at 306.) Salyers reported watching television, sometimes helping with housework and visiting with family. (R. at 306.) Salyers reported experiencing anxiety attacks all day long and into the night. (R. at 306.) He further reported an inability to engage in hobbies like hunting due to physical limitations and having anxiety attacks in the woods. (R. at 306.) He reported that he could maintain hygiene independently, with the exception of assistance required secondary to back pain. (R. at 307.) Although he reported a history of recurrent depression, he denied seeing a psychiatrist or counselor. (R. at 307.) Salyers denied a sad mood and most symptoms of depression. (R. at 307.) He acknowledged suicidal ideation with a plan, but denied intention. (R. at 307.) Salyers reported a previous episode of possible mania, during which he stayed up for six days and had an elevated mood. (R. at 307.) He

denied frank hallucinations, but reported hearing footsteps and his name and seeing a black shadow. (R. at 307.) Salyers reported a two and one-half year history of difficulty controlling excess worry. (R. at 307-08.) He acknowledged symptoms of panic disorder, including a fear of something bad happening, shakiness, increased heart rate, shortness of breath, nausea, sweating and difficulty swallowing. (R. at 308.)

Nies administered the Wechsler Adult Intelligence Scale – Fourth Edition, ("WAIS-IV"), which yielded a full-scale IQ score of 77, placing Salyers in the borderline range of intellectual functioning. (R. at 309-11.) Salyers scored in the extremely low range in verbal comprehension, in the low average range in perceptual reasoning and in working memory and in the average range in processing speed. (R. at 310.) He completed one self-report mood inventory, on which he endorsed items consistent with severe levels of depression and anxiety. (R. at 310.) Salyers was administered two symptom validity tests, on which he performed below expectation. (R. at 311.) He also performed below expectation on a validity measure embedded within the test battery. (R. at 311.) Therefore, Nies concluded that Salyers's presentation was not credible. (R. at 311.) Salyers's inexplicably low performance raised questions as to the validity of all test results, as well as his self-reported symptoms. (R. at 311.) Nies opined that Salyers could perform at least as well as the average range scores indicated, and she opined that it was unlikely the impaired scores were an accurate reflection of Salyers's neurological status at that time, but likely reflected psychological issues, such as secondary gain. (R. at 311.) Nies diagnosed cognitive disorder, not otherwise specified, by report; major depressive disorder, recurrent, severe, without psychotic features; generalized anxiety disorder; and rule out bipolar disorder; and she recommended continued pharmacological treatment. (R. at 311-12.)

When Salyers returned to Stone Mountain on March 9, 2010, requesting a Klonopin refill, his anxiety was controlled. (R. at 328.) He was fully oriented with normal memory, mood and affect, judgment and insight. (R. at 329.) Salyers was diagnosed with anxiety, was advised to avoid triggers and to continue taking Klonopin. (R. at 330.) On June 8, 2010, Salyers wished to discuss an increase in his Klonopin dosage. (R. at 325.) A review of systems was positive for anxiety, but he was fully oriented with normal memory, mood and affect, judgment and insight. (R. at 325-26.) Salyers again was diagnosed with anxiety, was advised to avoid triggers and to continue Klonopin. (R. at 327.) On September 17, 2010, Salyers requested another Klonopin refill. (R. at 321.) A review of symptoms indicated no psychiatric symptoms, and he was fully oriented with normal memory, mood and affect, judgment and insight. (R. at 321-22.) Salyers was diagnosed with anxiety and was advised to continue Klonopin. (R. at 323.) On December 15, 2010, no psychiatric symptoms were noted. (R. at 318.) Salyers was fully oriented with normal memory, mood and affect, judgment and insight, he was diagnosed with anxiety, and he was continued on Klonopin. (R. at 319-20.)

When Salyers returned to the emergency department at Lonesome Pine Hospital on January 24, 2011, with complaints of a headache of abrupt onset, he was alert and fully oriented with normal cognition and speech. (R. at 375-76.) His mood and affect were normal, and he was cooperative and interactive. (R. at 376.)

Salyers treated at Stone Mountain on February 23, 2011, noting no psychiatric symptoms. (R. at 315-16, 417-18.) He was fully oriented. (R. at 316, 418.) On March 23, 2011, while the provider noted that Salyers continued to have a cough, sinus drainage and congestion, his other conditions were "stable." (R. at 413.) Again, no psychiatric symptoms were noted. (R. at 413.) Nonetheless,

Salyers was diagnosed with anxiety, and he was continued on Klonopin. (R. at 415.) When Salyers returned on April 12, April 19, and May 4, 2011, no psychiatric symptoms were noted, and no psychiatric diagnoses were rendered. (R. at 403-05, 407-12.)

Joseph Leizer, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), on April 5, 2011, in connection with Salyers's initial disability claim. (R. at 62-63, 72-73.) Leizer found that Salyers had no restrictions on his activities of daily living, experienced no difficulties maintaining social functioning, experienced mild difficulties maintaining concentration, persistence or pace and had not experienced repeated episodes of decompensation of extended duration. (R. at 62, 72.) Leizer found no evidence of a severe mental impairment and that Salyers should be able to perform all levels of work. (R. at 63, 73.)

Salyers began seeing Crystal Burke, LCSW, a licensed clinical social worker at Stone Mountain, on May 23, 2011. (R. at 504.) Salyers reported taking Klonopin and Lexapro, which was helping him "a little." (R. at 504.) He stated that he avoided activities and often withdrew to his bedroom. (R. at 504.) Salyers stated that he previously enjoyed outdoor activities, hunting and fishing, but no longer had any desire to do so. (R. at 504.) Salyers was alert and oriented with a depressed mood and thought content with depressive features. (R. at 504.) Burke opined that he appeared to have some significant symptoms of depression and panic disorder. (R. at 504.) They discussed coping strategies, she allowed Salyers to vent, and Burke encouraged him to take his medications as prescribed. (R. at 504.) Salyers returned to Burke on June 22, 2011, reporting that he had attempted to go fishing and also go into a large retail store, but had to leave both due to anxiety and severe

panic attacks. (R. at 505.) He reported continued isolation, difficulty concentrating and memory problems. (R. at 505.) Salyers stated that relaxation techniques were unsuccessful. (R. at 505.) He was alert and oriented with fair grooming and hygiene, he had a depressed mood, was anxious and had thought content with depressive features. (R. at 505.) He denied any suicidal ideations. (R. at 505.) Burke opined that Salyers might benefit from medication adjustments and continued counseling supports. (R. at 505.)

When Salyers returned to Stone Mountain on June 29, 2011, he reported no psychiatric symptoms, and he was fully oriented with normal memory, mood and affect, insight and judgment. (R. at 529-30.) He was diagnosed with anxiety, among other things, and was continued on Klonopin. (R. at 531.)

Julie Jennings, Ph.D., a state agency psychologist, completed a PRTF in connection with the reconsideration of Salyers's disability claim on July 18, 2011. (R. at 85-86, 97-98.) She made the same findings as psychologist Leizer in April 2011, concluding that Salyers did not suffer from a severe mental impairment. (R. at 85-86, 97-99.) It again was noted that, although Salyers occasionally felt nervous, he could perform daily activities without severe limitations. (R. at 91, 103.)

On October 19, 2011, Salyers returned to Burke with complaints of daily panic attacks and isolating himself because people got on his nerves. (R. at 503.) He reported no suicidal ideations. (R. at 503.) Salyers's communication and eye contact was good. (R. at 503.) He was diagnosed with depression / anxiety, and stressors and coping techniques were discussed. (R. at 503.) Salyers was advised to seek out activities and emotional support and use coping techniques for panic

attacks. (R. at 503.) Salyers also was seen at Stone Mountain on that date for a follow up. (R. at 526-28.) He complained of a flare up of his "seizure" disorder and a rash on his left arm. (R. at 526.) All other conditions were deemed "stable." (R. at 526.) Salyers did not note any psychiatric symptoms, and he was fully oriented with normal memory, affect and mood, judgment and insight. (R. at 527.) He was diagnosed with anxiety and continued on Klonopin. (R. at 528.) On February 13, 2012, Salyers returned for another follow-up appointment, at which time he reported daily anxiety attacks and social anxiety. (R. at 522-25.) However, Salyers stated that Lexapro was helping. (R. at 522.) He was diagnosed with uncontrolled anxiety, and Lexapro was restarted. (R. at 523.) Salyers returned to Stone Mountain on February 23, 2012, with sinus-related complaints. (R. at 519-21.) He reported no psychiatric symptoms, and no psychiatric diagnosis was rendered at that time. (R. at 519, 521.)

On February 27, 2012, Salyers saw Burke, reporting continued panic attacks, poor sleep and nightmares, among other things. (R. at 503.) He reported he could not account for time lapses several times weekly, poor concentration and memory impairment. (R. at 502.) Salyers was alert and oriented, and he denied suicidal or homicidal ideation. (R. at 503.) He was anxious and reported stress and tension at home. (R. at 503.) Salyers was diagnosed with a panic disorder and a depressive disorder, and Burke encouraged him to relax. (R. at 503.)

Salyers returned to Stone Mountain on May 15, 2012, with various complaints, including experiencing two to three panic attacks daily. (R. at 515-18.) Nonetheless, he was fully oriented with a normal memory, mood and affect, judgment and insight. (R. at 516.) Salyers was diagnosed with anxiety, and BuSpar was prescribed. (R. at 518.)

-14-

On June 15, 2012, Burke completed a mental assessment, indicating that Salyers had a good ability to understand, remember and carry out simple job instructions, a fair ability to follow work rules, to function independently and to understand, remember and carry out both complex and detailed job instructions and a poor or no ability to relate to co-workers, to deal with the public, to use judgment, to interact with supervisors, to deal with work stresses, to maintain attention and concentration, to maintain personal appearance, to behave in an emotionally stable manner, to relate predictably in social situations and to demonstrate reliability. (R. at 508-10.) Burke opined that Salyers would be absent more than two workdays monthly due to his impairments or treatment. (R. at 510.) She based her findings on Salyers's diagnoses of panic disorder with agoraphobia; post-traumatic stress disorder, ("PTSD"); and depressive disorder. (R. at 508.)

Salyers returned to Stone Mountain on June 18, 2012, for a follow up on his anxiety. (R. at 512-14.) He was fully oriented with a normal memory, mood and affect, judgment and insight. (R. at 513.) Salyers's dosage of BuSpar was increased, and he was advised to taper off Klonopin once his anxiety was better controlled. (R. at 514.) On July 18, 2012, Salyers continued to complain of anxiety. (R. at 556-58.) He was fully oriented with normal memory, judgment and insight and an anxious mood and affect. (R. at 557.) He was diagnosed with unimproved anxiety, his dosage of BuSpar was increased, and he was again advised to taper the Klonopin. (R. at 558.)

Salyers returned to Burke on July 25, 2012, reporting good days and bad days. (R. at 605.) He reported bad panic attacks that were interrupting his sleep, but Salyers stated that an increased BuSpar dosage had helped some. (R. at 605.) He further reported some feelings of depression, but he was alert and oriented with

-15-

fair hygiene. (R. at 605.) Burke noted that Salyers appeared depressed and anxious, and she opined that he continued to exhibit problems with anxiety and depression. (R. at 605.) They discussed coping strategies, and she allowed Salyers to vent. (R. at 605.) On October 1, 2012, Salyers reported significant relational stressors after breaking up with his girlfriend, as well as poor sleep due to pain and anxiety. (R. at 604.) He reported continued daily panic attacks with little relief from medications and relaxation techniques. (R. at 604.) Salyers denied suicidal ideation, but reported some sadness regarding hunting season, stating "I just can't enjoy it." (R. at 604.) He stated that he used to hunt daily, but only did so two or three times the previous year. (R. at 604.) Burke described Salyers as anxious and mildly depressed. (R. at 604.) She diagnosed depressive disorder, not otherwise specified; and anxiety state, unspecified; and she encouraged coping strategies. (R. at 604.)

Salyers saw Phil Pack, M.S., a licensed psychological practitioner, for a psychological evaluation at the request of Disability Determination Services on July 30, 2012. (R. at 546-51.) Salyers was talkative and participated in the assessment. (R. at 546.) Salyers reported experiencing anxiety attacks for the previous 10 years, noting that he sometimes had them "all day long," and other times had them at night when he would lie down. (R. at 547.) He alleged that he had 10 to 15 panic attacks daily. (R. at 547.) However, he was unable to identify any triggers. (R. at 547.) Salyers reported undergoing monthly counseling for the previous year and a half and learning relaxation techniques, which sometimes helped, but he denied inpatient treatment. (R. at 547.) He further reported episodes of auditory and visual hallucinations, including hearing voices and seeing things in the yard when nothing was there. (R. at 547.) Salyers denied suicidal ideation. (R. at 547.)

Salyers reported driving two to three times weekly, sometimes grocery shopping, doing laundry and fixing simple meals. (R. at 548.) He stated that he lived in a camper on his sister's property because he did not want to be around people. (R. at 548.) Salyers reported that he liked to hunt and fish in the past, but no longer did so due to severe panic attacks. (R. at 548.) He reported socializing with some family members, taking care of his own finances and appointments and tending to his own self-care without difficulty. (R. at 548.) Salyers's speech was clear, and he had good eye contact. (R. at 548.) Overall rapport was easily established and maintained. (R. at 548.) Pack deemed his concentration and attention as good, noting that Salyers could remember three of three objects immediately. (R. at 549.) His mood was described as pleasant and friendly. (R. at 549.) Pack noted that, while Salyers alleged continuous anxiety attacks, he did not seem to be particularly anxious or experiencing any difficulties on that date. (R. at 549.) Salyers's rate and pace of speech were within normal limits, and his thought process was clear and formed with no long-standing issues. (R. at 549.) Salyers's insight and judgment into the nature of his difficulties were deemed poor. (R. at 549.)

Pack diagnosed mood disorder, not otherwise specified; rule out personality disorder; and rule out cognitive disorder, not otherwise specified, by report; and Salyers's then-current Global Assessment of Functioning, ("GAF"),[7] score was

---

[7] The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychological Association 1994).

assessed at 65.[8] (R. at 549-50.) He deferred making a prognosis pending an updated neurological workup and access to Salyers's general medical records. (R. at 550.) Pack concluded that Salyers had a fair ability to understand straightforward direction and instruction, he could live alone, travel, manage finances and overall communicate his needs and function in a fairly independent manner. (R. at 550.) His ability to complete a normal workweek without disruption from his psychiatric issues was deemed poor, and he seemed to have developed a chronic pattern of somatic preoccupation and anxiety, although there was likely a degree of exaggeration to his style and responses. (R. at 550.) Salyers's ability to secure and arrange travel and attend to his own shopping, cooking, cleaning, household chores, money, mail, bills, appointments and self-care were deemed good. (R. at 550.) On the interview date, Pack opined that Salyers's mental status was essentially unremarkable with regard to the general interview. (R. at 551.) On formal tasks, Salyers presented in somewhat dramatic fashion with regard to his overall complaints and allegations, and Pack suggested a review of his updated medical and psychological records. (R. at 551.)

Pack also completed a mental assessment, indicating that Salyers's abilities to understand, remember and carry out instructions were not affected by his impairment. (R. at 543-45.) He found that Salyers was mildly limited in his abilities to interact appropriately with the public, with supervisors and with co-workers and markedly limited in his ability to respond appropriately to usual work situations and to changes in a routine work setting. (R. at 544.) He concluded that

---

[8] A GAF score of 61 to 70 indicates "[s]ome mild symptoms … OR some difficulty in social, occupational, or school functioning … but generally functioning pretty well, has some meaningful interpersonal relationships." DSM-IV at 32.

Case 2:14-cv-00015-PMS   Document 15   Filed 09/25/15   Page 18 of 32   Pageid#: 704

no other capabilities were affected by Salyers's impairment. (R. at 544.) Pack provided no support for his findings. (R. at 543-45.)

On August 18, 2012, Salyers saw Dr. Victoria Grady, M.D., for another consultative examination at the request of Disability Determination Services. (R. at 563-67.) Among his chief complaints was anxiety, which he began experiencing approximately 12 to 13 years previously. (R. at 563-64.) Salyers stated that his anxiety was worsening and described the symptoms as feeling like a heart attack. (R. at 564.) He stated that he did not want to be around anyone. (R. at 564.) Salyers stated that he saw a counselor monthly, and his primary care physician prescribed medications, which helped. (R. at 564.) He reported past suicidal ideations, but denied any psychiatric hospitalizations or homicidal ideations. (R. at 564.) Salyers stated that he loved to deer hunt, but had "slacked down to doing nothing" because he had bad panic attacks in the woods. (R. at 564.) He also reported liking to fish, but stated he had only gone twice that year due to panic attacks. (R. at 564.) He was alert and fully oriented. (R. at 565.) Dr. Grady diagnosed anxiety and depression, among other things, and she recommended a psychiatry or psychology evaluation based on his report of suicidal ideations. (R. at 566.)

On September 18, 2012, Salyers returned to Stone Mountain with continued complaints of anxiety. (R. at 597-600.) He was fully oriented with normal memory, mood and affect, insight and judgment, and he made good eye contact. (R. at 598.) Salyers was diagnosed with anxiety and panic attacks, he was continued on Lexapro, and his dosage of BuSpar was increased. (R. at 600.)

On November 13, 2012, B. Wayne Lanthorn, Ph.D., a licensed clinical psychologist, completed a psychological evaluation of Salyers at the request of counsel. (R. at 579-88.) Salyers was fully oriented. (R. at 580.) He reported having undergone counseling with Burke for the previous year and a half. (R. at 582.) He placed his then-current depression level at an eight or nine on a 10-point scale, but noted that antidepressant medication helped somewhat. (R. at 583.) Salyers reported working in his yard, visiting with his children and grandchildren, performing a minimal amount of housecleaning and socializing with his girlfriend and family members. (R. at 583.) He reported no longer deer hunting or going into stores due to panic problems. (R. at 583.) Salyers's grooming and hygiene were good, his affect was generally flat and blunt, and he was obviously quite on edge and tense. (R. at 583.) Overall, his mood could best be described as an agitated depression. (R. at 583.) Salyers indicated that he heard people talking at times and heard his name being called. (R. at 583.)

Salyers admitted some suicidal ideation, but denied any plans or intent. (R. at 583.) He reported erratic to poor short-term memory, but intact long-term memory, as well as difficulty with concentration and mind wandering. (R. at 584.) Salyers also reported frequent panic attacks, during which he felt like he was having a heart attack, and which lasted for 10 to 20 minutes. (R. at 584.) He stated that his anti-anxiety medication, BuSpar, was only marginally helpful. (R. at 584.) Salyers reported awakening throughout the night with both pain and anxiety. (R. at 584.) He seemed on edge, and rapport was established only to a fair degree. (R. at 584.) After 10 minutes, Salyers could remember only one out of five words presented to him earlier. (R. at 584.) He correctly performed serial 7's, but he could not interpret any of three commonly used adages. (R. at 584.) He also could not spell the word "world" either forward or backward. (R. at 584.)

Lanthorn administered the WAIS-IV, which he believed yielded valid results, accurately reflecting Salyers's then-current degree of intellectual functioning. (R. at 584-85.) Salyers achieved a full-scale IQ score of 66, placing him in the extremely low range, compared to a 77 obtained in his prior psychological testing in 2010 with Nies. (R. at 585.) Lanthorn opined that the difference in scores could be attributed to the passage of time, as well as Salyers's report that his condition had deteriorated. (R. at 585.) Salyers earned a verbal comprehension index of 72, a perceptual reasoning index of 71, and a working memory index of 74, all placing him in the borderline range, and a processing speed index of 68, placing him in the extremely low range. (R. at 585.) Lanthorn also administered the Minnesota Multiphasic Personality Inventory – Second Edition, ("MMPI-2"), indicating the presence of moderate to severe levels of emotional distress, problems with concentration, memory deficits and lessened judgment. (R. at 586.) Testing further indicated that Salyers was quite withdrawn and spent most of his spare time alone. (R. at 587.) Test results also indicated the presence of significant and severe depression, which contributed to poor concentration and social withdrawal. (R. at 587.) Finally, testing indicated that Salyers had difficulties with worry, anxiety, tension and emotional discomfort, also contributing to problems with concentration. (R. at 587.) Lanthorn opined that Salyers's psychopathology was serious enough that it included confused thinking and difficulties with logic, as well as impaired judgment. (R. at 587.)

Lanthorn diagnosed Salyers with major depressive disorder, recurrent, severe; anxiety disorder with both panic attacks and generalized anxiety disorder; cognitive disorder, not otherwise specified; rule out pain disorder associated with both psychological factors and general medical conditions; and borderline

intellectual functioning; and he placed Salyers's then-current GAF score at 50.[9] (R. at 587-88.) He assessed Salyers's prognosis as "quite guarded" and strongly recommended continued psychotherapeutic intervention. (R. at 588.) Lanthorn recommended that Salyers also see a psychiatrist to ensure that all prescribed psychotropic medications have maximum efficacy. (R. at 588.) He concluded that Salyers was functioning in the borderline range overall intellectually. (R. at 588.) Lanthorn noted the 11-point drop in Salyers's overall full-scale IQ from the current result and Dr. Nies's result, which could be an indicator of continuing cognitive decline, overall. (R. at 588.)

Lanthorn also completed a mental assessment, indicating that Salyers had a good ability to understand, remember and carry out simple job instructions and to maintain personal appearance. (R. at 590-92.) He opined that Salyers had a fair ability to follow work rules, to interact with supervisors, to function independently, to maintain attention and concentration, to understand, remember and carry out detailed job instructions, to behave in an emotionally stable manner and to relate predictably in social situations and a poor or no ability to relate to co-workers, to deal with the public, to use judgment, to deal with work stresses, to understand, remember and carry out complex job instructions and to demonstrate reliability. (R. at 590-91.) Lanthorn opined that Salyers would be absent from work more than two days monthly due to his impairments or treatment therefor. (R. at 592.) He based these findings on the diagnoses he had placed upon Salyers. (R. at 590.)

Burke completed another mental assessment of Salyers on January 9, 2013, finding that he had a good ability to understand, remember and carry out simple

---

[9] A GAF score of 41 to 50 indicates "[s]erious symptoms … OR any serious impairment in social, occupational, or school functioning. …" DSM-IV at 32.

job instructions, a fair ability to follow work rules, to understand, remember and carry out detailed job instructions, to maintain personal appearance, to behave in an emotionally stable manner, to relate predictably in social situations and to demonstrate reliability and a poor or no ability to relate to co-workers, to deal with the public, to use judgment, to interact with supervisors, to deal with work stresses, to function independently, to maintain attention and concentration and to understand, remember and carry out complex job instructions. (R. at 616-17.) She opined that Salyers would be absent from work more than two days monthly due to his impairments or treatment therefor. (R. at 618.) Burke based her findings on Salyers's panic disorder and agoraphobia. (R. at 616.)

Salyers saw Burke a week later on January 16, 2013, with complaints of daily anxiety attacks and some blackout episodes. (R. at 607-08.) He reported continuing isolation most of the time. (R. at 607.) Salyers stated that BuSpar did not help, and he stated several times during the interview that "[m]y nerves are killing me." (R. at 607.) Nonetheless, he reported that Klonopin helped sometimes. (R. at 607.) Salyers reported a lack of usual activities, but stated he enjoyed short visits with his children. (R. at 607.) He reported poor concentration and memory and often feeling frustrated. (R. at 607.) Salyers was anxious, and he appeared frustrated with his health issues. (R. at 607.) He was appropriately dressed and groomed. (R. at 607.) Salyers's problem list included generalized anxiety disorder and transient alteration of awareness. (R. at 608.) He was taking Klonopin and Celexa. (R. at 608.) Burke diagnosed agoraphobia with panic disorder and depressive disorder, not elsewhere classified. (R. at 608.) Supportive counseling and coping strategies were recommended. (R. at 608.)

### III.  Analysis

The Commissioner uses a five-step process in evaluating DIB and SSI claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2015). *See also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920.  If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a) (2015).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner.  To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. §§ 423(d)(2)(A), 1382c(a)(3)(A)-(B) (West 2011 & West 2012); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute

its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays*, 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. §§ 404.1527(c), 416.927(c), if he sufficiently explains his rationale and if the record supports his findings.

Salyers argues that the ALJ erred by making incomplete findings at step three of the sequential evaluation process. (Plaintiff's Memorandum In Support Of His Motion For Summary Judgment, ("Plaintiff's Brief"), at 5-6). Specifically, Salyers argues that the ALJ erred by failing to explain how he determined that Salyers's impairments did not satisfy the "paragraph B" criteria of § 12.06, the listing for anxiety-related disorders. (Plaintiff's Brief at 5-6.) Salyers also argues that the ALJ erred by failing to give full consideration to psychologist Lanthorn's findings regarding the severity of his mental impairments and their resulting effects on his ability to work. (Plaintiff's Brief at 6-8.) As noted above, Salyers does not challenge the ALJ's finding as to his physical residual functional capacity.

After a review of the evidence of record, I find Salyers's arguments unpersuasive. Step three of the sequential evaluation requires the ALJ to determine whether Salyers has an impairment that meets or equals the criteria of a listed impairment. The burden of making such a showing rests with the claimant. *See Radford v. Colvin*, 734 F.3d 288, 291 (4th Cir. 2013) (citing *Hancock v. Astrue*, 667 F.3d 470, 472-73 (4th Cir. 2012)). It is well-settled that, in order "[f]or a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) (emphasis in original).

Here, the record shows that the ALJ stated in his decision that Salyers's mental impairments, considered singly and in combination, did not meet or medically equal the criteria of § 12.06. (R. at 19.) Specifically, he found that the "paragraph B" criteria of § 12.06 were not satisfied. (R. at 19.) Paragraph B of § 12.06 requires that a claimant's mental impairment result in at least two of the following: (1) marked restriction of activities of daily living; or (2) marked difficulties in maintaining social functioning; or (3) marked difficulties in maintaining concentration, persistence or pace; or (4) repeated episodes of decompensation, each of extended duration. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.06(B) (2015). The ALJ found that Salyers was limited as follows: mild restriction in activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence or pace; and no episodes of decompensation, each of extended duration. (R. at 19.) The ALJ stated as follows: "[t]his conclusion is supported by the evaluation of evidence discussed in detail below." (R. at 19.) In the remainder of the decision,

-26-

the ALJ proceeded to analyze the medical evidence of record, including the psychological evidence, to determine Salyers's residual functional capacity.

In particular, the ALJ found that Salyers was limited, to a degree, in his activities of daily living, but the daily activities he did perform were inconsistent with his complaints of prolonged and consistent disabling functional limitations. For instance, the ALJ noted Salyers's report to neuropsychologist Nies in February 2010, that he watched television, sometimes helped with housework and visited family. (R. at 21.) Likewise, in July 2012, Salyers informed Pack that he lived alone in a camper on his sister's property, drove two to three times weekly, grocery shopped at times, did laundry, prepared sandwiches, tended to basic self-care without difficulty and kept up with his own money, mail, bills, appointments and bank accounts. (R. at 23.) The ALJ also noted that Salyers reported to Dr. Grady in August 2012 that he went fishing twice that year, and in November 2012, he informed psychologist Lanthorn that he worked in his yard, visited his children and grandchildren, cooked on rare occasion, performed some minimal housework, read and watched television a little and socialized with his girlfriend and family members. (R. at 22-23.) Lastly, the ALJ noted Salyers's hearing testimony, in which he reported driving to see his daughter and grandchildren, living alone in a camper on his sister's property, staying at his girlfriend's at times, eating with his sister at times, taking care of household chores, fishing, mowing with a riding mower, changing the oil and brakes on vehicles and walking through the woods. (R. at 24.) He further reported gong to Walmart with his girlfriend. (R. at 24.) In further support of his step three determination, the ALJ noted that in May 2009, despite Salyers's assertions of anxiety, insomnia and depression, he was alert and oriented. (R. at 21.) In February 2010, neuropsychologist Nies found that he was alert and oriented, despite a depressed mood, tearfulness and depressive thought

content. In June 2011, Salyers was deemed to be alert and oriented with fair grooming and hygiene, despite his report of having to leave a fishing trip and a retail store due to anxiety and panic attacks. (R. at 22.) Likewise, in July 2012, Salyers was deemed alert and oriented with fair grooming and hygiene, despite depression and anxiousness. (R. at 22.) From September 2009 through September 2012, Salyers's psychiatric examinations at Stone Mountain were consistently unremarkable, revealing full orientation and normal memory, mood, affect, judgment and insight. (R. at 22.) In August 2012, a mental status evaluation was unremarkable, revealing that Salyers was alert and fully oriented. (R. at 22.) In July 2012, mental status evaluation revealed clear speech, good eye contact, an easily established and maintained rapport, good concentration, a pleasant and friendly mood, clear thought processes with no anxiousness or depressive features and no suicidal ideations or aggressive impulses. (R. at 22.) Finally, in November 2012, mental status evaluation revealed, among other things, good grooming and hygiene, good appetite and a fair degree of rapport with no visual hallucinations or homicidal ideations. (R. at 23-24.) I find that the ALJ's thorough recitation of the evidence of record supports his finding at step three of the sequential evaluation process that Salyers's impairments do not meet or equal the criteria for the medical listing for anxiety-related disorders, found at 20 C.F.R., Part 404, Subpart P, Appendix 1, § 12.06.

Next, I find that the ALJ did not err by failing to give full consideration to psychologist Lanthorn's findings regarding the severity of his mental impairments and their effects on his ability to work. The ALJ must consider objective medical facts and the opinions and diagnoses of both treating and examining medical professionals, which constitute a major part of the proof in disability cases. *See McLain*, 715 F.2d at 869. The ALJ must generally give more weight to the opinion

of a treating physician because that physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2) (2015). Here, Lanthorn is not a treating source of Salyers. Thus, his opinion is not entitled to "controlling weight" even if supported by the clinical evidence and even if consistent with the other substantial evidence of record. Instead, the ALJ must consider the following factors in deciding how much weight to assign to Lanthorn's opinion: (1) the length of treatment of the claimant; (2) the frequency of examination of the claimant; (3) the nature and extent of the treatment relationship; (4) support of the source's opinion afforded by the medical evidence of record; (5) consistency of the opinion with the record as a whole; and (6) specialization of the source. *See* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).

The ALJ stated that he was giving little weight to the clinical findings and assessments of Lanthorn because they were mainly based on Salyers's subjective complaints. (R. at 24.) The court notes that psychologist Lanthorn did, in fact, administer objective psychological testing to Salyers, including the WAIS-IV and the MMPI-2, the results of which he deemed valid. The WAIS-IV results yielded a full-scale IQ score of 66, placing him in the extremely low range of intellectual functioning, and the MMPI-2 suggested that Salyers was experiencing moderate to severe levels of emotional distress, problems with concentration, memory deficits, lessened judgment, social withdrawal, significant and severe depression and difficulties with worry, anxiety and tension. Lanthorn opined that Salyers had a good ability to understand, remember and carry out simple job instructions and to maintain personal appearance, a fair ability to follow work rules, to interact with supervisors, to function independently, to maintain attention and concentration, to understand, remember and carry out detailed job instructions, to behave in an

emotionally stable manner and to relate predictably in social situations and a poor or no ability to relate to co-workers, to deal with the public, to use judgment, to deal with work stresses, to understand, remember and carry out complex job instructions and to demonstrate reliability. He opined that Salyers would be absent from work more than two days monthly due to his impairments or treatment therefor. Thus, I find that the ALJ simply incorrectly noted that Lanthorn's findings were based mainly on Salyers's subjective complaints. Nonetheless, for the reasons that follow, I find that the ALJ did not err by according little weight to Lanthorn's opinion.

First, Lanthorn examined Salyers on only one occasion at the request of counsel. Thus, the length and frequency, as well as the nature and extent of Lanthorn's treatment, do not warrant giving his assessment any greater weight. Second, Lanthorn's opinion is not supported by the other substantial evidence in the record. Although Salyers argues that Lanthorn's opinion is consistent with the findings of licensed clinical social worker Burke, the ALJ found that Burke's opinions were based mainly on Salyers's subjective complaints. A review of the records confirms that this is true, as Burke did not employ any type of psychological testing in evaluating Salyers. Lanthorn's opinions also are not supported by psychologist Nies's opinion that Salyers's presentation was noncredible and that his extremely low testing scores and self-reported symptoms were questionable based on his below expected performance on two symptom validity tests. Nies concluded that Salyers could perform "at least as well as the average scores indicated," and she opined that it was unlikely that the impaired scores were an accurate reflection of his then-current neurological status, but likely reflected psychological issues, such as secondary gain.

Lanthorn's opinions also are not consistent with psychological practitioner Pack's findings, which included that Salyers had good attention and concentration, displayed a pleasant and friendly mood and, despite Salyers's allegations of continuous anxiety attacks, he did not seem to be particularly anxious or experiencing any difficulties on the date of the interview. Pack further deemed Salyers's speech to be normal and his thought process to be clear. Pack assessed a then-current GAF score of 65, indicating only mild symptoms. Pack concluded that Lanthorn's mental status was essentially unremarkable and that he was mildly limited in his ability to interact appropriately with the public, with supervisors and with co-workers and markedly limited in his ability to respond appropriately to usual work situations and to changes in a routine work setting.

Lanthorn's opinions also are not supported by the largely unremarkable mental status evaluations or with Salyers's own reports of activities of daily living, both as cited above. Furthermore, Lanthorn's opinions are not supported by the conservative nature of the treatment of Salyers's mental impairments. He has received no emergent, inpatient or outpatient psychiatric treatment, but has been prescribed medications by his general practitioner and has undergone counseling with Burke, who recommended relaxation techniques and coping strategies. By Salyers's own admissions, some of these medications helped his symptoms. "If a symptom can be reasonably controlled by medication or treatment, it is not disabling." *Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986).

Lastly, I note that Lanthorn is a specialist in the mental health field, so this factor does cut in favor of granting more weight to Lanthorn's opinions. However, given the other factors just discussed, this factor alone cannot tip the scale in favor of granting more weight to Lanthorn's opinions. It is for all of these reasons that I

find that substantial evidence supports the ALJ's decision to grant little weight thereto. Based on the same medical evidence cited, I find that substantial evidence also supports the ALJ's mental residual functional capacity finding.

Based on the above reasoning, I conclude that substantial evidence supports the ALJ's weighing of the psychological evidence, and I further find that substantial evidence exists in the record to support the ALJ's mental residual functional capacity finding. An appropriate order and judgment will be entered.

DATED:     September 25, 2015.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE